## CHICAGO, R. I. & P. R. CO. v. GARRISON.

No. 22823. Nov. 20, 1934.

Rehearing Denied Dec. 4, 1934.

Application for Leave to File Second, Petition for Rehearing Denied Dec. 11, 1934.

W. R. Bleakmore, W. L. Farmer, John Barry, and Robt. E. Lee, for plaintiff in error.

Suits & Disney and Mary L. Weiss, for defendant in error.

PER CURIAM. Defendant in error, as plaintiff below, brought this action against the railway company for damages in transporting for plaintiff 231 head of cattle and calves from Logan, N. M., the point of origin, to Oklahoma City, the point of destination. Plaintiff's petition sets forth two causes of action for damages, though not separately stated and numbered as such. He alleges that as the owner of 231 head of cattle and calves, "at about 12 o'clock noon" on September 28, 1929, he "delivered said cattle and calves to the defendant at Logan, N. M., for loading and transportation to Oklahoma City, Okla."; that he had been "advised by defendant's agent at Logan, N. M., at the time he ordered the cars for shipping said cattle and calves, that said shipment would be moved out of Logan some time during the afternoon of Saturday, September 28th, and acting upon said promise and agreement. plaintiff penned said cattle about 1 o'clock p. m. on said date," and "that though said cattle were penned and loaded in plenty of time to have been moved at the time promised by defendant's agent, said shipments were actually not moved out of Logan, N. M., until 6 o'clock a. m., on Sunday, September 29th, and did not reach Oklahoma City until the morning of Tuesday, October 1st." After alleging that said cattle "were all in good order" and that "upon delivery of said cattle and calves to the defendant it thereby became the duty of said defendant to expeditiously carry and convey the same over its line of railway and there deliver said shipment to the plaintiff at Oklahoma City," plaintiff proceeds to further allege "that the defendant negligently and carelessly handled the trains in which such shipments of cattle were being transported; that said trains were handled in a rough and unusual manner; that said cars in which said cattle and calves were being transported were jerked, bumped, kicked and switched about by said defendant in a rough and unusual manner, with the result that said cattle and calves were scarred and bruised upon reaching the market at Oklahoma City, and presented a stale and stupid appearance when placed upon the market on October 1, 1929, with the result that they brought 25 cents less per hun dred pounds than they would have bought but for such negligence and carelessness on the part of the defendant; that said shipments of cattle and calves weighed 83,910 pounds, and at 25 cents per hundred pounds amounts to $209.77; for which sum said defendant has become liable to this plaintiff." That may be designated as plaintiff's first cause of action.

The jury returned a verdict for plaintiff for the exact sum of $209.77, upon which judgment was duly entered, motion for a new trial filed, overruled, exceptions made, and notice of appeal given by defendant.

Briefly stated, the first cause of action is for alleged "personal injuries" sustained by the cattle, which, in turn, if proved, damaged the plaintiff to the extent of the difference between the market value of unscarred and unbruised cattle and injured cattle in the amount of $209.77, according to his allegations.

There is not a scintilla of evidence in the record showing or tending to show that the cattle "were scarred and bruised upon reaching the market at Oklahoma City."

Although, as held in Eastern Elevator Co. v. A., T. & S. F. Ry. Co., 93 Okla. 20, 219 P. 332, the failure of the railroad company "to deliver" live stock "in proper condition within a reasonable time" raises

the presumption of negligence and casts the burden upon the railroad company to excuse itself, nevertheless there is no presumption that live stock were scarred and bruised by an unreasonable delay in shipment. That is a question of fact easily proven by an examination of the cattle.

The defendant requested the court to instruct the jury to return a verdict in its favor, and if this were all in the case we would be forced to sustain the third assignment of error based on the trial court's refusal to instruct the jury to return a verdict in defendant's favor. However, plaintiff further alleges "that by reason of the carelessness and negligence of said defendant" (a) "in delaying said shipment at Logan, N. M.," and (b) "transporting said shipment of cattle and calves, as hereinbefore described, said cattle were caused to shrink in weight an average of 30 pounds per head, aggregating 6,930 pounds, at an average of $10.45 per 100 pounds, amounting to $724.18," and that "said shrink upon said animals was over and above what they would have shrunk if they had been transported within the usual and customary time and with reasonable care." Plaintiff also alleges that on account of delay in transportation of the cattle they were unloaded at El Reno, Okla., and fed, at a cost of $16 to the plaintiff. Then, in general, plaintiff alleges:

"That by reason of all the facts herein alleged and by reason of the said carelessness and negligence of the said defendant, its agents, servants, and employees, and by reason of the defendant carelessly and negligently delaying said shipment at Logan, N. M., and at different places along its said line of railway, and by reason of the carelessness and negligence of said defendant's employees in charge of said trains, causing same to be unnecessarily jerked, bumped, kicked and switched about at its various stations, said defendant has become liable and indebted to this plaintiff in the following sums:

"Excess shrink of 30 pounds per head, aggregating 6,930 pounds at 10.45 _____$724.18

"Loss, on account of stale and stupid appearance, 83,910 pounds at 25c per cwt. _____ 209.77

"Extra feed _____ 16.00

$950.35"

He prays for judgment "in the sum of $950.35, and for the costs of this action."

Although plaintiff did not allege the Oklahoma City Tuesday market was lower than on Monday, the cattle buyer testified it was lower.

As there is no mathematical standard by which the mental operations of the jury can be measured, and as the verdict cannot be sustained for scarring and bruising the cattle in transportation, we will assume for the moment that the jury's verdict was for damages for pound shrinkage blended with cattle staleness and stupidity, by nature not always an unusual characteristic of the brute. Whether the verdict can be sustained on this theory depends upon whether or not there was an unreasonable delay in transportation, and this in turn involves the question of fact as to when the cattle were delivered to the defendant for transportation, as the defendant's liability as a common carrier, as distinguished from that of warehouseman, is an issue. Defendant contends its responsibility as a common carrier of the cattle began at 6:00 a. m. Sunday morning, whereas plaintiff contends it began not later than 7:00 p. m. on Saturday before. Over exceptions of defendant, now assigned as error, the trial judge instructed the jury as follows:

"7. You are instructed that the undisputed evidence in this case shows that on or about 1 o'clock p. m., on the 28th day of September, 1929, the plaintiff delivered at the stock pens of the defendant at Logan, N. M., certain calves or cattle to be transported by the defendant to Oklahoma City, Okla., and you are now instructed that in the transportation of said cattle it was the duty of the defendant to exercise ordinary care and diligence in the transportation of the same, but it was under no obligation to transport the same upon any particular train or trains.

"8. You are further instructed that if you find and believe from a preponderance of the evidence in this case that at the time plaintiff made arrangements with the agent or the defendant at Logan, N. M., for cars in which said cattle was to be transported and delivered to plaintiff in Oklahoma City, that defendant's agent advised plaintiff that the train upon which said cattle would be transported would leave Logan, N. M., at 2 o'clock p. m., on Saturday September 28, and that plaintiff, acting upon said advice and relying upon the same, delivered said cattle at the pens of the defendant at Logan, N. M., in time for said cattle to be sorted and loaded on said train, and you further find that defendant did not provide a train for the transportation of said cattle as promised and advised by defendant's agent, and that no train was provided by defendant for the transportation of the same until about 6 o'clock a. m., September 29th, and you further find that there was unusual and unnecessary delays in the loading and

transportation of said cattle and that said delays were caused and brought about by the carelessness and negligence of the defendant, and that plaintiff's cattle were thereby damaged and injured and that said damage and injury was directly and proximately caused by the carelessness and negligence of the defendant, then in that event your verdict should be for the plaintiff."

Plaintiff's undisputed testimony shows (a) that there were 231 sucking calves, although several of them weighed in excess of 600 pounds; (b) that he purchased them from a man by the name of Ward and drove them a distance of ten miles or more from Ward's ranch to Logan, N. M.; (c) that he started from the ranch early Friday morning, September 27th, about 6 o'clock and reached Logan about noon on Saturday, the 28th; (d) that he drove the calves' mothers along with them from the ranch to Logan, N. M.; (e) that the only food they had from the time they left the ranch until they reached Logan was what they got by grazing and sucking as they roamed and rambled along; (f) that when he reached Logan he put the cows and calves together in the railroad stock pens, and that he did not complete the separation of the cows from the calves until about 4:30 Saturday afternoon; (g) that his seller, in plaintiff's presence, ordered the cars on September 24th for shipment of the cattle on Saturday afternoon and was informed by defendant's agent at that time the cars would be started out about 7:00 o'clock p. m. on Saturday; (h) that he was notified by the railroad station agent on Saturday afternoon that no train would be through to pick up the cars until Sunday morning, although he asked for a train to remove the cars on Saturday evening, and (i) that the cars were not loaded until 6 o'clock a. m. Sunday morning, and did not reach Oklahoma City until 9:25 Tuesday morning, October 1st.

The evidence also shows that the four cars containing the calves were laid over at Tucumcari, the division point, from 7:20 a. m. Sunday until 11:55 a. m. Sunday; that they arrived at El Reno at 2:00 p. m. Monday, September 30th, where the cattle were unloaded, fed, watered and rested and left for Oklahoma City at 3:30 a. m. Tuesday morning, October 1, and arrived at Oklahoma City at 9:25 a. m. October 1st. From 7:00 o'clock p. m. Saturday, the hour defendant's agent had told plaintiff the cars would be started, to the hour of arriving in Oklahoma City, was 62 hours and 25 minutes. The only feeding the cattle had from the time they arrived in Logan, N. M., at noon on Saturday until they arrived in Oklahoma

City on Tuesday, was the one at El Reno, Okla., on the afternoon of Monday, September 30th.

Plaintiff was asked this question:

"Mr. Garrison, what effect does it have upon cattle to keep them penned and in the cars and on the road for the length of time that these cattle were in the pens or on the cars?" to which he replied, "Well, it shrinks the cattle and they don't look so well; they will shrink in weight and they look bad, and it makes the cattle sell mean."

Luther Eoff, one of plaintiff's witnesses and a salesman for the American Livestock Commission Company, was introduced as an expert witness, and was asked this question by plaintiff's counsel, to which defendant did not object:

"Q. Mr. Eoff, in this case we have a shipment of 231 head of calves averaging around 350 to 400 pounds, some of them slightly over 400 pounds, that was penned at Logan, N. M., on Saturday September 28, 1929, and kept in the pens there that afternoon and loaded out Sunday morning at 6 o'clock for shipment in to the Oklahoma City market, and they were on the road from Sunday morning until 9:45 a. m., Tuesday morning, at which time they were unloaded at the stockyards here in Oklahoma City, the testimony in this case being that the usual and customary time for shipping cattle from Logan, N. M., to Oklahoma City is about 36 hours, these cattle being on the road about 24 hours longer. State whether or not they would have an extra shrink by reason of that extra 24 hours?"

—to which he answered, "Yes, sir; they would have an extra shrink, of course."

He was also asked this question, to which no objection was made:

"Taking into consideration the kind of cattle I have described to you here, what, in your opinion, would be the amount of that shrink—I forgot to state to you that these calves had been sucking cows up until the time they were penned at Logan, N. M., and were separated on that date from the cows; taking that into consideration, too, what, in your opinion, would be that extra shrink?"

—to which he answered, "Say around 25 or 30 pounds."

Eoff was asked this question, to which defendant did not object:

"Q. It has been testified by the plaintiff in this case that these calves were driven from a ranch starting early Friday morning, and were grazed along through other ranches, the cows traveling along with the calves, and resting Friday night, then being driven again Saturday morning in the same manner, and being penned at 1 o'clock,

638

at which time the cows were separated. The plaintiff testifies the calves were not fed anything Saturday afternoon or Saturday night, and were loaded out Sunday morning; state whether or not that handling of of the calves was the usual and customary method under the circumstances?"

He answered: "I don't think they would need any feed Saturday night, if they had been with their mothers all day."

The calves were not delivered to the railroad for transportation until the cows had been separated from them in the pens.

As said in 10 C. J., page 225:

"Delivery cannot be complete if anything remains to be done by the shipper before the goods can be sent on their way."

Plaintiff testified the calves were not ready for loading until about 4:30 p. m., and admits that he was informed by the railroad agent at the time the cars were ordered that there would not be any train to take them out of the station until about 7:00 o'clock p. m. Saturday.

Moore on Carriers (2d Ed.) vol. 1, p. 170, says:

"The party bringing the goods must first do whatever is essential to enable the carrier to commence, or to make needful preparations for commencing, the service required of it, before it can be made liable or subjected to responsibility in that capacity. * * * A carrier is responsible, as a carrier, only when goods are delivered and accepted by it for immediate transportation in the usual course of business. When a consignor of goods delivers them to a carrier, relinquishing all control over them, the carrier becomes immediately liable as a common carrier: but if the goods are merely placed in the carrier's depot for the consignor's convenience, and are not ready for shipment until the consignor has done something further to them, the carrier is not so liable."

This court has sustained this rule. See Atchison, T. & S. F. Ry. Co. v. Homewood, 39 Okla. 179, 134 P. 856, 48 L. R. A. (N. S.) 990, and Kansas City, Mexico & Orient Ry. Co. v. Cox, 25 Okla. 774, 108 P. 380, 32 L. R. A. (N. S.) 313.

In Atchison, T. & S. F. Ry. Co. v. Homewood, supra, this court quoted with approval Barron v. Eldredge, 100 Mass. 455, wherein the court said:

"The responsibility of a common carrier for goods intrusted to him commences when there has been a complete delivery for the purpose of **immediate transportation**. * * * The delivery must be for immediate transportation, and, of course, it cannot be complete if anything remains to be done by the

shipper before the goods can be sent on their way."

Plaintiff was not delivering the cows to the railroad for transportation. When he put the cows and calves together in the pens it was plaintiff's duty to sort out the cows, separate them from the calves, and put them out of the pen. This occurred about 4:30 p. m., according to plaintiff's testimony. If the evidence as to the time of the delivery to the railroad was uncontroverted, then it became a question of law as to whether or not the evidence proved the delivery and the exact time it took effect. Whether the evidence on a particular or specific issue of fact is sufficient to go to the jury is a question of law. McDonald v. Strawn, 78 Okla. 271, 190 P. 558; Chicago, R. I. & P. Ry. Co. v. Cheek, 105 Okla. 91, 231 P. 1078; Columbia Ins. Co. v. Chatterjee, 93 Okla. 249, 219 P. 102. If the evidence on the particular issue is insufficient, it is the duty of the court to withdraw that issue from the jury and tell the jury that such fact is or is not established. Byers v. Ingraham, 51 Okla. 440, 151 P. 1061; Gypsy Oil Co. v. Ginn, 88 Okla. 99, 212 P. 314; Landauer v. Sublett, 126 Okla. 185, 259 P. 234; Kenyon v. Perry, 113 Okla. 188, 240 P. 702; Eagle Biological & Supply Co. v. Breed, 90 Okla. 7, 215 P. 424; Frazier v. McCary, 110 Okla. 138, 236 P. 880. If the court, by his seventh and eighth instructions to the jury, intended to rule as a question of law that the calves were delivered to the defendant as a common carrier for shipment at either 1 o'clock or 2 o'clock p. m. on Saturday, September 28th, it was in error because something remained for the shipper to do—that was, separate the cows from the calves and take the former out of the pens. On the other hand, the railroad, relying on Swift v. McMurray, 133 Okla. 104, 271 P. 635, contends that if the facts introduced to prove the time of delivery were in dispute, that is, if there was an issue of fact as to the time of delivery, then the court was in error by its instructions Nos. 7 and 8, because they constituted an invasion of the province of the jury.

How much ultimate shrinkage, if any, was attributable to the period between 1 p. m. Saturday to 4:30 p. m. Saturday, or from 1 p. m. to 7 p. m. Saturday, is not shown. However, there is expert testimony in the record that they suffered none during that period.

After carefully twice reading all the evidence and putting ourselves, as far as an appellate court can do so, in the atmosphere of the trial, we conclude the jury, in arriving at its verdict, did not take into consid-

eration the period of time between noon Saturday and 7 o'clock p. m. Saturday, September 28th.

John Clark, one of plaintiff's witnesses, in the cattle business at Oklahoma City, was asked this question:

"Q. Now, Mr. Clark taking into consideration that these cattle were penned at Logan, N. M., on Saturday afternoon about 1 o'clock, September 28th, and were kept in the pens there from that time 'till 6 o'clock Sunday morning, September 29th, and were then loaded and started on their way to the market at Oklahoma City and were unloaded at El Reno on Monday sometime and reloaded out of El Reno Tuesday morning, and arriving at the stockyards at 9:45 Tuesday morning, it having been about 68 hours from the time they were penned until they were unloaded here, what effect would that have upon the class of cattle shipped by Mr. Garrison with reference to shrinkage?"

Upon the trial court sustaining an objection to this question, plaintiff's counsel asked the witness the following question:

"Q. Mr. Clark, if the cattle were on the road 24 hours longer than the usual and customary time, which has been testified to here was about 36 hours, what effect would that have on the cattle, that is, would there be a greater shrink by reason of them being on the road this extra 24 hours than there would have been in 36 hours?"

This clearly indicated that plaintiff was confining his proof to the 24-hour delay arising between 7 p. m. on Saturday, September 28th, and 9:25 a. m. Tuesday, October 1st.

On original examination plaintiff was asked this question:

"What, in your judgment, would these calves shrink over and above the normal shrink where they were delivered 24 hours longer than the usual and customary time from bringing them from New Mexico to Oklahoma City?"

—to which he answered. "It would be anywhere from 30 to 40 pounds per head."

This shows that plaintiff was not contending for any shrinkage or damage for the delay between 1 o'clock p. m. Saturday and 7 o'clock p. m. Saturday.

Clark testified that he saw the cattle upon their arrival in Oklahoma City and that their condition indicated they had been on the road too long and that on account of their appearance their market value was around 50 cents per 100 pounds less on Tuesday market than if they had been fresh.

The court's seventh instruction to the jury does not specifically state, as a fact, that the plaintiff delivered the cattle to the defendant at Logan, N. M., at 1 o'clock p. m. on Saturday, September 28th, but that plaintiff delivered the cattle "at the stock pens of the defendant at Logan, N. M." Assuming that the jury was unable to see the distinction between "delivery to defendant" and "delivery at the stock pens" at 1 o'clock p. m., it would have been an easy thing for defendant to request the trial court to clear this up and specifically rule on the question.

Defendant's third request for instructions, refused and exception allowed, asked the court to instruct the jury "that the plaintiff cannot recover herein, if at all, for any natural shrinkage or stale appearance of said cattle, nor can the plaintiff recover if at all, for any shrinkage, or on account of any stale or stupid appearance of said cattle occurring prior to the date and time said cattle were loaded on defendant's cars and the contract was made and entered into between the plaintiff and defendant." This request was too broad in that it excluded from the jury's consideration the delay between 7 p. m. Saturday and 6 a. m. Sunday morning. It was rightly denied by the trial judge.

From "an examination of the entire record" it does not appear "that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." The size of the verdict refutes the contention that the court's erroneous instructions Nos. 7 and 8 influenced the jury. The evidence would support a larger verdict.

The 5th paragraph of the syllabus to Fidelity-Phenix Fire Ins. Co. v. School District No. 10, 80 Okla. 290, 196 P. 700, says:

"Where it is manifest by the verdict that the jury was not misled by the giving of an erroneous instruction, and no prejudicial error was committed, the case will not be reversed because of such erroneous instruction."

Under the directions of section 3206, Okla. Stats. 1931, as applied in Grayson v. Brown, 166 Okla. 43, 26 P. (2d) 204, Strasburg v. Tudor, 101 Okla. 109, 223 P. 635, Melton v. First National Bank, 109 Okla. 294, 233 P. 441, Town of Davis v. Thomason, 130 Okla. 21, 264 P. 877, Citizens Bank v. Beeson, 104 Okla. 293, 231 P. 844, and numerous other decisions of this court, we decline to set aside the verdict of the jury and order a new trial.

The judgment of the trial court is therefore affirmed.

The Supreme Court acknowledges the aid of Attorneys Geo. S. Ramsey, Everett Petry, and J. H. Maxey in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Ramsey and approved by Mr. Petry and Mr. Maxey, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.